# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SUSAN HELEN SCOTT**, | ) |
| Plaintiff | ) ) ) |
| v. | ) 02:13-cv-00671-TFM ) |
| **CAROLYN W. COLVIN**, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

August 1, 2014

## I.  Introduction

Susan Helen Scott ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final determination of the Commissioner of Social Security ("Commissioner"), which denied her application for supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383(f). The parties have filed cross-motions for summary judgment, with briefs in support, and the Commissioner has also filed a reply brief. (ECF Nos. 8-12). The record was thoroughly developed at the administrative level. (ECF Nos. 6-1 through 6-10). Accordingly, the motions are ripe for disposition.

## II.  Background

### A.  Facts

Plaintiff was born on November 4, 1979. (R. 24). She has a high-school education in a learning support curriculum. (R. 24). She is unmarried and is the mother of two minor children, ages 11 and 7 years. (R. 24). She alleges disability as of January 1, 2002, due to "depression, anxiety, social problems, boils, [and] stomach pain," with past relevant work experience as a

personal care aide in a nursing home. (R. 26, 182). Years prior to alleging disability, she also worked at various fast-food restaurants and a hotel. (R. 183). Moreover, starting in January 2010, she worked at a factory job for two months, (R. 38), and at the time of the administrative hearing, she was working part-time as a dishwasher at a restaurant, (R. 41). Nevertheless, the ALJ found that this did not amount to substantial gainful activity. (R. 22).

### 1. Evidence Related to Plaintiff's Alleged Mental Health Impairments

On July 2, 2009, Plaintiff presented to the Irene Stacy Community Mental Health Center ("Irene Stacy") for a psychiatric evaluation with Randon Simmons, M.D., and Dennis Love, a physician assistant, complaining of depression and anxiety. (R. 224-30). Plaintiff reported that her symptoms began when she was about 10 years old but had recently worsened. (R. 224). She also reported that she had never attempted to treat her conditions. (R. 224). Despite her conditions, Plaintiff explained that she could take care of her children, though she did sometimes put off housework. (R. 224). Upon examination, Plaintiff displayed fluent speech, maintained good eye contact, and did not show signs of irritability or distractibility. (R. 225). Also, her recall and orientation were intact and her insight and judgment were good. (R. 225). Based upon the examination, Plaintiff was diagnosed with major depressive disorder, recurrent; nicotine dependence; a partner relational problem; a history of substance abuse; and obesity. (R. 227). It was recommended that she start taking Celexa, an anti-depressant, and Buspar, an anxiolytic psychotropic drug. (R. 225). She was also advised to attend individual counseling. (R. 225).

Plaintiff was scheduled for a medication check on August 24, 2009, which she failed to attend. (R. 227). She also failed to respond to attempts to reach her. (R. 227). Accordingly, her

case was closed for non-compliance. (R. 227).[1]

On August 25, 2010, Julie Uran, Ph.D., performed a consultative psychological evaluation of Plaintiff.[2] (R. 232-42). Dr. Uran noted that Plaintiff had a history of medical issues, including lumbar back pain, headaches, abdominal pain, and soreness/a lump on her left foot. (R. 232). Plaintiff admitted to a history of substance abuse, but reported that she stopped using drugs in 1998. (R. 233). She also reported a history of intense anger, which caused her to strike objects at times, and explained that she experienced hallucinatory voices or noises approximately once per month and suffered from mild-to-severe depression, manifested by crying and withdrawal, tiredness, and apathy. (R. 238). Furthermore, she told Dr. Uran that her anxiety was causing tremors and she felt that others were talking about her, watching her, or following her. (R. 238). Dr. Uran diagnosed Plaintiff with major depressive disorder with psychotic features, generalized anxiety disorder, and below average IQ (rule out), and assessed a GAF score of 55. (R. 235, 238).[3]

Dr. Uran opined that Plaintiff had no restrictions in understanding, remembering, and carrying out short, simple instructions; between "moderate" and "marked" restrictions understanding, remembering, and carrying out detailed instructions; and slight restrictions making judgments on simple, work-related decisions. (R. 238). Moreover, she opined that

---

1. Plaintiff also received treatment from Irene Stacy for a period of time in 2006, but her case was closed for non-compliance after the initial evaluation. (R. 227).

2. Dr. Uran also examined Plaintiff in 2006, at which time she diagnosed her with major depressive disorder (recurrent), anxiety disorder, mathematics disorder, nicotine dependence, borderline intellectual functioning, personality disorder, and obesity. (R. 267). During this examination, Dr. Uran administered the WAIS-III, according to which Plaintiff had a verbal IQ of 83, a performance IQ of 74, and an overall IQ of 77. (R. 263).

3. A patient's GAF score measures, on a scale of 0-100, the overall effect of her mental health disorder on her ability to function in activities of daily living, as well as socially and occupationally. *See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Revised* 34 (4th ed. Text Rev., Am. Psych. Assoc. 2000) (hereinafter, "*DSM-IV*").

Plaintiff had "marked" restrictions in interacting with the public and responding appropriately to work pressures in a usual work setting, but moderate restrictions interacting appropriately with supervisors and co-workers and responding appropriately to changes in a routine work setting. (R. 239).

On September 9, 2010, Emanuel Schnepp, Ph.D., a state agency psychologist, reviewed Plaintiff's records and completed a Psychiatric Review Technique form, in which he opined that Plaintiff had moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace, and only mild restrictions in activities of daily living. (R. 243-61). He also completed a Mental RFC Assessment form, in which he found that Plaintiff was either not significantly limited or moderately limited in all areas except understanding, remembering, and carrying out detailed instructions and interacting appropriately with the general public. (R. 243-44). In those two areas, Dr. Schnepp found that Plaintiff had "marked" limitations. (R. 243-44).

Plaintiff had a psychiatric evaluation with Dr. Simmons and Mr. Love on June 27, 2011 because she was "trying to get SSI." (R. 284). She described mood-related symptoms, including depression, irritability, low energy, and decreased concentration and interest – for which she had never sought any treatment. (R. 284). She said that she used to like to read books, but could no longer sustain her concentration long enough to do so. (R. 284). She also described feeling excessively worried about financial stressors. (R. 284). Mr. Love noted that Plaintiff likely had sleep apnea and encouraged her to contact her primary care physician to schedule a sleep study. (R. 285). Based on his examination, he diagnosed her with panic disorder with agoraphobia and a history of drug abuse (in remission), and noted that she had been non-compliant with previous attempts to treat her condition. (R. 286). He also prescribed Buspar and Celexa and

4

recommended that she attend individual counseling. (R. 285).

Plaintiff followed-up in late August for a medication check. (R. 283). At that time, she reported that she did not feel any better and was experiencing additional stress because her fiancé had recently been sent to jail. (R. 283). Plaintiff agreed to try taking Cymbalta, an anti-depressant, and to continue taking Buspar. (R. 283). She also reported that she planned to undergo a sleep study, as recommended, after her children started back to school, but there is no evidence in the record to indicate that this study occurred. (R. 283).

At Plaintiff's counsel's request, Robert Eisler, M.D., examined Plaintiff and performed a psychiatric evaluation on November 30, 2011, (R. 376). Dr. Eisler diagnosed Plaintiff with major depressive disorder with psychosis, generalized anxiety disorder with panic, severe social phobia, attention deficit hyperactivity disorder ("ADHD"), and mild retardation. (R. 376-379). He concluded that the prognosis was poor and assessed a GAF score of 20. (R. 376-379). He further opined that she would be unemployable for at least the next year. (R. 376-379). In addition, he opined that Plaintiff had poor-to-no ability to follow work rules, interact with supervisors, deal with work stresses or the public, maintain concentration and pace, and understand/remember/carry out complex or detailed instructions. (R. 376-379). However, he also found that she had fair ability to relate to co-workers, use judgment, function independently, and understand/remember/carry out simple job instructions. (R. 378).

In a medical assessment form completed for the Pennsylvania Department of Welfare in December 2011, Dr. Simmons opined that Plaintiff would be temporarily incapacitated until May 27, 2012, due to panic disorder with agoraphobia. (R. 373-375). He also noted that she had a history of polysubstance abuse and had been the victim of abuse. (R. 375).

### 2. Evidence Related to Plaintiff's Physical Impairments

Plaintiff treated with Primary Health Network from May 26, 2009, until June 24, 2011, for various physical conditions. (R. 380-407). At various times in 2009 and 2010, she complained of having "boils" on her skin, a cyst on her foot, pain in her ankles, lower back pain, and abdominal pain. (R. 396, 397, 401). X-rays from the time period revealed mild scoliosis and some narrowing of the L3-4, L4-5, and L5-S1 discs, which suggested that she had degenerative disc disease. (R. 407). Plaintiff also went to the ER twice in 2009 with complaints of ankle pain, and X-rays confirmed that the cause was soft tissue swelling. (R. 288-307, 349-50).

Plaintiff saw Gretchen Bishop, CRNP, on June 29, 2010, with multiple complaints and "wanting disability papers filled out for anxiety, depression, possible sleep apnea, and urinary incontinence with abdominal bloating." (R. 230). Nurse Bishop noted that Plaintiff had been receiving treatment for her mental health issues at Irene Stacy, but had been discharged because she frequently missed her appointments. (R. 230). She also noted that Plaintiff's gynecologist had ordered her to undergo an abdominal and pelvic ultrasound, but she never followed through. (R. 230). Upon examination, Plaintiff appeared to be "[a] pleasant, calm, appropriate female patient who is overweight, in no acute distress." (R. 230). No abnormalities were noted. (R. 230). Nurse Bishop recommended that she continue with her psychiatric treatment, schedule a sleep study to determine if she actually had sleep apnea, and continue seeing her gynecologist for urinary incontinence and bloating. (R. 230).

In November 2010, Plaintiff was seen by Michael Neiswonger, CRNP, having complaints of right foot pain, for which she was scheduled to have surgery. (R. 385). Plaintiff also reported that she had boils on her skin. (R. 385). Nurse Neiswonger noted that overall Plaintiff was "doing well." (R. 385). She was not on any medications, and although she had a history of

depression and anxiety, she was not then receiving any treatment for those conditions. (R. 385). Nurse Neiswonger prescribed Plaintiff with Bactrim to treat her boils and cleared her for foot surgery. (R. 385).

Plaintiff returned to Nurse Neiswonger's office on December 13, 2010; January 7, 2011; and March 23, 2011. (R. 382-84). During the first two visits, she was observed to be doing well. (R. 383-84). In March, her main reason for seeing Nurse Neiswonger was to get him to fill out a disability form for the Pennsylvania Department of Welfare. (R. 382). Plaintiff claimed that she was unable to work because of intermittent lower back pain. (R. 382). She also complained of intermittent cramping in her stomach and anxiety and depression. (R. 382). Nurse Neiswonger informed Plaintiff that her back pain and cramping were insufficient to establish that she was disabled. (R. 382). He also explained that "from a medical perspective, [he could not] determine that she is disabled because she has anxiety and depression." (R. 382). According to Nurse Neiswonger, Plaintiff was "very unhappy with this response. She seemed to expect that [the disability form] was just going to be filled out." (R. 382).

Plaintiff went to the emergency room ("ER") on February 26, 2011, with complaints of pain related to a possible bladder infection. (R. 323). She also complained of an "aching" pain in her lumbar spine. (R. 324). The results of Plaintiff's physical examination were normal, though she was diagnosed with a urinary tract infection, and she was discharged in good condition. (R. 325). She was prescribed levofloxacin and hydrocodone-acetaminophen for pain and Cipro to treat her infection. (R. 325).

Plaintiff went to the ER again in October 2011, complaining of pain in her abdomen. (R. 334). She was prescribed Ultram for her pain and discharged later that day, at which time she was "feeling slightly better," although she still experienced some pain. (R. 339)

7

B.  **Procedural History**

Plaintiff protectively filed an application for SSI on May 18, 2010, in which she alleged disability as of January 1, 2002.[4] (R. 20-22). An administrative hearing was held on November 23, 2011, before Administrative Law Judge ("ALJ") James J. Pileggi. (R. 28). Plaintiff was represented by counsel and testified at the hearing, as did Patricia J. Murphy, an impartial vocational expert. (R. 20).

On February 6, 2012, the ALJ rendered an unfavorable decision to Plaintiff. (R. 24-28). The ALJ's decision became the final decision of the Commissioner on March 12, 2013, when the Appeals Council denied Plaintiff's request to review the decision of the ALJ. (R. 1-4).

On May 15, 2013, Plaintiff filed her Complaint in this Court, in which she seeks judicial review of the decision of the ALJ. (ECF No. 3). The parties have filed cross-motions for summary judgment. (ECF Nos. 8, 10). Plaintiff contends that the ALJ erred in finding that she retained the RFC to perform a limited range of light work. The Commissioner contends that the decision of the ALJ should be affirmed as it is supported by substantial evidence

**III.  Legal Analysis**

  A.  **Standard of Review**

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g), 1383(c)(3). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The United States Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (citation omitted). It

---

4.  Plaintiff also filed a claim for disability insurance benefits ("DIB") under Title II of the Act, which claim was denied at the initial level and not pursued further. (R. 126).

consists of more than a scintilla of evidence, but less than a preponderance. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 (3d Cir. 2010) (citation omitted).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520, 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his past relevant work, and (5) if not, whether he can perform other work that exists in significant numbers in the national economy. See 42 U.S.C. § 404.1520; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (citation omitted); 42 U.S.C. § 423 (d)(1). This may be done in two ways: (1) by introducing medical evidence that the claimant is disabled per se because he suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1, *see Heckler v. Campbell*, 461 U.S. 458 (1983); *Newell*, 347 F.3d at 545-46; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or, (2) if the claimant suffers from a less severe impairment, by demonstrating that he is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes him from returning to his

9

former job. *Newell*, 347 F.3d at 545-46; *Jones*, 364 F.3d at 503. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Rutherford*, 399 F.3d at 551; *Newell*, 347 F.3d at 546; *Jones*, 364 F.3d at 503.

### B. The ALJ's Decision

The ALJ determined that Plaintiff is "not disabled" within the meaning of the Act at the fifth step of the sequential evaluation process. In making this determination, the ALJ concluded that Plaintiff had the following "severe" impairments, none of which, however, met or equaled any of the Listed Impairments in 20 C.F.R. Pt. 404, Subpt. P, Appx. 1: degenerative disc disease, mild scoliosis, borderline intellectual functioning, major depressive disorder, and generalized anxiety disorder. (R. 22). The ALJ also noted that Plaintiff is obese and he took that factor into consideration in making his decision. (R. 22).

He proceeded to determine that Plaintiff has the RFC to perform light work "with no crawling, kneeling, climbing or balancing at heights." (R. 24). He also found that she is "limited to tasks that are simple and repetitive in nature involving routine work processes and in routine work settings;" "low stress work, which is here defined as work that involves no high rate production quotas and no close attention to quality production standards;" "should have no more than incidental contact with members of the general public;" is "unable to engage in team work;" and "is precluded from performing tasks requiring the operation of foot controls." (R. 24). Then, in reliance on the VE's testimony, the ALJ concluded that Plaintiff could perform work that exists in significant numbers in the national economy, and, therefore, was "not disabled." (R. 27-28).

10

**C. Discussion**

Plaintiff claims that the ALJ committed three separate errors in finding that she is "not disabled" under the Act. Her primary contention, however, is that the ALJ violated the so-called treating physician rule by disregarding the opinions of some of her "treating physicians and consultative evaluators." Pl.'s Br. at 10 (ECF No. 11). Specifically, she claims that the ALJ completely ignored the medical assessment forms completed for the Pennsylvania Department of Welfare by Dr. Leighton in 2006, Nurse Neiswonger in 2009 and 2010, and Dr. Simmons in June and December 2011, in which these sources opined that she was temporarily incapacitated. She also contends that the ALJ improperly rejected the opinions of Dr. Uran, the state consultative examiner, and Dr. Eisler, the examiner hired by her attorney. The Court finds both of these arguments to be entirely without merit.

First of all, two out of the five forms on which Plaintiff relies were prepared before the relevant time period, which began on May 18, 2010 (the date she filed her application)[5] and thus are "relevant to the analysis only to the extent that they are probative of [Plaintiff's] condition on or after that date." *Shoup v. Colvin*, No. 12-1019, 2013 WL 4455865, at *6 (W.D. Pa. Aug. 16, 2013) (citing *Reilly v. Office of Personnel Mgmt.*, 571 F.3d 1372, 1380–83 (Fed. Cir. 2009)). Unfortunately for Plaintiff, they are not. Therefore, the ALJ was entitled to reject these two forms without explanation. *See Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008). Even if these forms did relate to the relevant time period, the Court would not fault the ALJ for failing to specifically discuss them or, for that matter, for failing to discuss the other three forms that post-date the application date. Forms which indicate that a claimant is

---

5.   *See Torres v. Chater*, 125 F.3d 166, 171 n.1 (3d Cir. 1997) (citing 20 C.F.R. § 416.335; *Cruse v. Bowen*, 867 F.2d 1183, 1185 (8th Cir. 1989)) (noting "that SSI benefits are not payable for a period prior to a claimant's application").

temporarily incapacitated for the purpose of receiving welfare benefits are "irrelevant to the decision of the ALJ." *Cavaliero v. Astrue*, No. 09–190, 2009 WL 1684435, at *7 (W.D. Pa. June 16, 2009). Although such forms "may and should be considered, [they are] not binding on the Administration." *Id.* (citing 20 C.F.R. §§ 404.1504 and 416.904). That is because, as the regulations make clear, the question whether a claimant is disabled is ultimately reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(1). Indeed, our Appeals Court has cautioned that these types of forms are "weak evidence at best" and as such are entitled to little weight since they are entirely unsubstantiated by explanations and findings. *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). Thus, while the Court acknowledges that the ALJ did not specifically cite these forms in his discussion, that is ultimately of no moment. The result would have been the same even had he specifically discussed them because they would have been afforded little, if any, weight by the ALJ. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (citation omitted) (explaining that a case should not be remanded "for further specification where we are convinced that the ALJ will reach the same result").[6]

Plaintiff fares no better with her argument regarding the ALJ's treatment of the opinions of Dr. Uran and Dr. Eisler. As an initial matter, Plaintiff seems to overlook that neither of these doctors is a "treating source" as that phrase is defined in the regulations. Rather, they are both "nontreating" consultative examiners. *See* 20 C.F.R. § 416.902 ("The term [nontreating source] includes an acceptable medical source who is a consultative examiner for us, when the

---

6. The Court also notes that the medical records of Dr. Leighton consist only of the two-page medical assessment form. "There are no objective medical records to support the report, no mention of [Dr. Leighton] in previous medical records, nor any indication of his specialty, the length of his treatment relationship with Plaintiff, or any of the other factors to be considered when ascertaining the weight to be given to a medical opinion." *Cavaliero*, 2009 WL 1684435, at *7. Thus, although Plaintiff characterizes him as a "treating physician," the Court cannot actually decide whether he qualifies as such and, in turn, cannot decide whether his opinions would *ever* be entitled to special significance.

consultative examiner is not your treating source."). As such, their opinions could never be entitled to a presumption of controlling weight. 20 C.F.R. § 416.927(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."); Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *2 (SSA July 2, 1996) ("[O]pinions from sources other than treating sources can never be entitled to 'controlling weight.'"). Although opinions from a consultative examiner must be considered, the ALJ is free to reject some of those opinions or to reject them outright as long as he sufficiently explains his decision, *Johnson*, 529 F.3d at 202–04, and does not reject the opinions "'for no reason or for the wrong reason,'" *Rutherford*, 399 F.3d at 554 (quoting *Mason*, 994 F.2d at 1066).

The ALJ's decision here has satisfied that standard. Although the ALJ determined that Dr. Uran's opinions were entitled to "great weight" overall, he did not adopt her opinion regarding Plaintiff's "marked" limitation in responding to work pressures "in light of [her] recent employment." (R. 26). That is a reasonable conclusion since "[w]ork by a claimant after the alleged onset is probative evidence that the claimant may be capable of working." *Ward v. Astrue*, No. 10–240, 2010 WL 3522979, at *6 (W.D. Pa. Sept. 7, 2010) (citing *Sigmon v. Califano*, 617 F.2d 41, 42–43 (4th Cir. 1980); 20 C.F.R. §§ 404.1571; 416.971). The ALJ likewise properly concluded that Dr. Eisler's opinions were entitled to "little weight" because they appeared to be largely premised on Plaintiff's subjective complaints. (R. 26). As the Court of Appeals has explained, "the mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion." *Morris v. Barnhart*, 78 F. App'x 820, 824 (3d Cir. 2003) (citing *Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996)).

13

Inasmuch as the ALJ provided a sufficient reason for discounting Plaintiff's subjective complaints – which he did – then he also had a sufficient basis for discounting Dr. Eisler's opinions. *See id.* (citing *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989)). As the ALJ concluded, Plaintiff's complaints and, in turn, Dr. Eisler's opinions – including his finding that Plaintiff had a remarkably low GAF score of 20 – were largely unsupported and, in fact, contradicted by other substantial evidence in the record.[7] Accordingly, the Court finds that the ALJ's decision to accord "little weight" to Dr. Eisler's opinions is supported by substantial evidence.

Having concluded that the ALJ did not err in analyzing the opinion evidence and explaining his reasoning for rejecting some of the opinions in the record, Plaintiff's remaining two claims of error are easily disposed of. In support of her argument that the ALJ improperly determined her RFC, Plaintiff points only to the opinions in the five medical assessment forms and in the reports from Drs. Uran and Eisler. However, since the portions of these two reports on which Plaintiff relies were properly found to have been not credibly established, the ALJ did not err in incorporating these limitations in his RFC. Moreover, the ALJ's finding that Plaintiff could perform light work with several non-exertional limitations was supported by substantial evidence. The evidence regarding Plaintiff's physical conditions failed to show that she could not perform the requirements of light work. In fact, in the job she was performing at the time of the hearing, she was required to lift dishes and bus pans with dishes in them, which weighed

---

7. This GAF score is a real outlier. As the Commissioner argues, a GAF of 20 suggests the person is in "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene. . . OR [has] gross impairment in communication (e.g., largely incoherent or mute)." *DSM-IV* at 34. None of the other GAF scores in the record, which ranged from 55 to 60, come close to suggesting that Plaintiff exhibited such symptoms. Nor does Dr. Eisler's own report that finding.

approximately 15 pounds. (R. 46-47). She also was required to stand for long periods of time throughout the day, and did so seemingly without incident (though she was physically exhausted by day's end). (R. 46). Moreover, the ALJ adequately accommodated many of her complaints about back and leg pain by prohibiting her from crawling, kneeling, climbing, balancing, and using foot controls. (R. 24). Substantial evidence also supports the ALJ's finding that Plaintiff's mental impairments did not preclude her from performing simple, repetitive, routine work in a low-stress environment and without interacting with the public and working in teams. (R. 24). This finding was consistent with the opinions of Dr. Schnepp,[8] most of the opinions of Dr. Uran, Plaintiff's documented GAF scores, and the largely unremarkable mental status examinations described in the record.

Finally, the ALJ did not "improperly disregard the testimony of the vocational expert and rel[y] on an incomplete hypothetical question," as Plaintiff argues. Pl.'s Br. at 16 (ECF No. 11). For reasons already discussed, the ALJ's hypothetical accurately portrayed all of Plaintiff's "credibly established limitations." *Rutherford*, 399 F.3d at 551 (citing *Plummer*, 186 F.3d at 431)). The ALJ did not err in disregarding the VE's response to the questions that included limitations beyond those that he found to be supported by credible evidence. *Cf. Jones*, 364 F.3d at 506 (explaining that "because the hypothetical was inconsistent with the evidence in the record, the ALJ had the authority to disregard the response").

## IV. Conclusion

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic

---

8. Insofar as Plaintiff might also take issue with the ALJ's reliance on the state agency's consultant's opinions, she would be mistaken. The Court of Appeals has held that an ALJ may rely on the opinions of a state agency consultant, such as Dr. Schnepp, since they are "'experts in the Social Security Disability programs.'" *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (quoting 20 C.F.R. §§ 404.1527(f)).

and aware of the challenges which she faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Act.

For these reasons, the Court will grant the Motion for Summary Judgment filed by the Commissioner and deny the Motion for Summary Judgment filed by Plaintiff. An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SUSAN HELEN SCOTT**, | ) |
| Plaintiff, | ) |
| | ) 02:13-cv-00671-TFM |
| v. | ) |
| | ) |
| **CAROLYN W. COLVIN**, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| Defendant. | ) |

## ORDER OF COURT

**AND NOW**, this 1st day of August 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED,** and **DECREED** that the Commissioner's Motion for Summary Judgment is **GRANTED**, and Plaintiff's Motion for Summary Judgment is **DENIED**. The Clerk shall docket this case **CLOSED**.


BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc: Christine M. Nebel
   Email: cnebel220@aol.com

   Paul Kovac
   Email: paul.kovac@usdoj.gov

   Via CM/ECF